Filed 9/25/13  Kennedy v. Sadafi CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| GAEL KENNEDY, | B238253 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. LC081489) |
| LILA SADAFI, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court for Los Angeles County, Michael B. Harwin, Judge.  Affirmed in part, reversed in part.

Law Offices of Ron Gold and Ron Gold for Defendant and Appellant.

Ferguson Case Orr Paterson, Wendy C. Lascher and John A. Hribar for Plaintiff and Respondent.

Defendant Lila Sadafi appeals from a judgment awarding plaintiff Gael Kennedy $112,200 in compensatory damages and $225,000 in punitive damages on Kennedy's fraud claim. Sadafi raises many issues, most of which are unpersuasive, moot, or forfeited due to inadequate briefing and/or an inadequate record. Nevertheless, Sadafi's contention that the punitive damages award is improper because plaintiff failed to present evidence of Sadafi's net worth has merit. Accordingly, we reverse the punitive damages award but otherwise affirm the judgment.

## BACKGROUND

Sometime before the summer of 2006, Kennedy met a composer and conductor, Dino Zonic, who was looking for a screenwriter to write the story of his life during the Croatian war. Zonic asked Kennedy to write a spec script. Kennedy told a friend, Khaled Alawar, about Zonic. Alawar owned an art gallery in Ojai. At around the same time Kennedy told Alawar about Zonic, Sadafi came into the gallery to talk to him about a foundation. Alawar, who had known Sadafi for several years, told Sadafi that she should meet Kennedy because Kennedy was working with an amazing composer; he thought Sadafi could help Kennedy because of her connections. Alawar told Kennedy that Sadafi was a smart business woman, and well-connected to high-powered people.

Sadafi met with Kennedy and Zonic to discuss Zonic's plans to create a film and develop Unity Through Music, a project Zonic started in Europe. After watching Zonic's DVD, Sadafi told them she wanted to get involved with producing Zonic's concerts and film. Sadafi arranged for Kennedy, Zonic, Alawar, and Alawar's wife to go to Colorado with her to meet with Sadafi's billionaire friends, Hannah and Maurice Strom.

2

Kennedy and Sadafi took a strong liking to each other, and grew very close over the three days they spent in Colorado. After they returned from Colorado, they met or spoke with each other at least once a day, and usually more. Sadafi told Kennedy that she was a confidant and close friend of Hillary Clinton, and that Clinton had asked her to work as a fundraiser on her presidential campaign. Sadafi invited Zonic to go with her to a private birthday party for Clinton; when Zonic returned from the party, he told Kennedy there were only around 20 people there. During their daily conversations, Sadafi often told Kennedy of meetings she was having with powerful people due to her association with Clinton.

Shortly after the trip to Colorado, Sadafi told Kennedy and Alawar that she knew someone who could help with Zonic's Unity Through Music project. She said that this man, Michael Thurber, was a very successful businessman, who had a lot of access to money for the project. She told them that she had made investments with Thurber in the past, and had never lost money with him.

Sadafi arranged a lunch meeting with Thurber, Kennedy, Alawar, and Zonic. Thurber arrived in a limousine. After discussing Unity Through Music for a while, Thurber segued into a discussion of his new business opportunity, a company named Camex, which he called "a once in a lifetime opportunity." As they were leaving the lunch, Sadafi told Kennedy that she had known Thurber for years and had made a great deal of money with him, and that she and her brother Mohammad were each going to invest $50,000 in Camex. She told Kennedy that she thought the investment was closed, but that she would talk to Thurber to see if she could get Kennedy into the investment because she wanted Kennedy to make a lot of money.

Both Kennedy and Alawar decided to give Thurber money to invest in Camex. Kennedy invested $50,000, and Alawar invested $75,000.[1] Kennedy invested because she trusted Sadafi; Sadafi was her friend, Sadafi told her that she had made a lot of money with Thurber and that she and her brother were each investing $50,000, and Sadafi told her that her relationship with Clinton required that she be totally upfront and honest. Alawar invested because Sadafi told him that Thurber was completely trustworthy, and that she had had several dealings with him and made a lot of money.

In October 2006 -- a month or two after the meeting with Thurber -- Sadafi and Kennedy entered into a written agreement under which Sadafi would become Kennedy's business manager for all of Kennedy's movie writing projects. At the time they entered into the agreement, Kennedy and Sadafi had discussions about Sadafi helping Kennedy with her finances, because Kennedy did not know anything about investing, and Sadafi had a lot of experience.

In late December 2006, Sadafi told Kennedy and her husband, Paul, that Thurber had run off with all of the money that people had invested in Camex. Sadafi apologized, saying that this had never happened to her, and offered to write the Kennedys a check for $50,000. She told them, however, that she was going to reorganize the company under a different name, and they could get stock in that company for the same amount instead of taking the check. She said that they would make the same amount of money they would have made with Camex. She also said that if at any time they wanted to sell back the stock, she would write them a check for $50,000. Kennedy and her husband agreed to take the stock, believing they had nothing to lose. The name of the new company was Facinet;

---

[1] Sadafi told Kennedy that she (Sadafi) would get a commission from Camex or Thurber on all of the money Sadafi brought into the deal.

4

both Kennedy and Alawar eventually received stock certificates in the new company, which they subsequently discovered were worthless.

Kennedy, Alawar, and others who had invested with Thurber wanted to file a lawsuit against him. Alawar spoke with Sadafi about trying to locate Thurber to go after him. Sadafi said that she would take care of it, but nothing came of it. Alawar eventually filed a complaint with the California Department of Corporations, and the Department issued a cease and desist order against Thurber.[2] In the meantime, Kennedy contacted an attorney, and asked everyone to provide documentation of their investments to the lawyer. When Kennedy later called the lawyer to see whether they could proceed, the lawyer told her that she had not received any documentation from Sadafi. Kennedy called Sadafi, who told Kennedy that she had mailed two checks or money orders to Thurber in Mexico, and gave Kennedy an express mail document as proof of her payments.[3]

At around the same time, in late 2007, Sadafi told Kennedy that she had heard from Clinton's people that the economy was going to crash, and said that Kennedy should get out of any investment she had. At the time, Kennedy had her own and her parents' money invested in mortgages; the investment was paying seven percent. A friend of Kennedy told her about an investment advisor who was very conservative, and Kennedy wanted to meet with him. She asked Sadafi to go with her, since Sadafi was her business manager and Kennedy did not know

---

[2] At trial, Sadafi objected to the evidence of the complaint and order, on grounds that it was not relevant and was hearsay, but the objection was overruled.

[3] After the instant lawsuit was filed, Sadafi stated that she paid Thurber through her husband's private American Express account. When Kennedy requested proof, Sadafi said that she could not get copies of the American Express bills because she and her husband were divorced and he had returned to Iran. Kennedy obtained copies of Sadafi's ex-husband's American Express bills for all of 2006, and noted there was one payment made to Net Serve Computer Software -- a company owned by Thurber -- for $26,000.

anything about investing, but Sadafi said, "Don't invest with anybody. Just listen to what I tell you." Despite the problem with the Camex investment, Kennedy remained close to Sadafi, and still trusted her.

Sadafi told Kennedy that she had sold some land to a very well-known builder named Paul Lascola. Sadafi said that she wanted to work with Lascola to build a world class spa or three houses on the property. Lascola would be the builder and Sadafi would bring him the funds for the project. Sadafi encouraged Kennedy to invest in the project. Kennedy told Sadafi that she would be investing her own and her mother's retirement money, so she could not afford to lose it. Sadafi assured her that it would be safe because Lascola owed her $200,000 for the property, and she could foreclose if he did not pay. She told Kennedy that there was no chance that Lascola would default on Kennedy's investment, and that it would be a one-year bridge loan.

Kennedy met with Lascola a couple of weeks before she made the loan. She did not ask for any documents related to the property because Sadafi was handling all of her business affairs. Kennedy believed Sadafi was well versed in real estate transactions because Sadafi told her she was a real estate broker, she invested in property and land, including commercial real estate, and she was involved in several businesses in Los Angeles and Arizona. Kennedy therefore relied on Sadafi to do the due diligence regarding the loan.

In January 2008, Kennedy gave Lascola checks for $50,000 from her account and $30,000 from her mother's account. The checks were made out to Conejo Partners, which Lascola told her was his private company. Lascola gave Kennedy two promissory notes: one for $30,000 and one for $50,000. Under the notes, Lascola would make interest-only payments for a year, and would pay the principal at the same time he paid Sadafi the $200,000 he owed her. Kennedy understood that he would be giving her deeds of trust to secure the loans.

6

Lascola made the first monthly interest payment on time. When he was late making the second payment, Kennedy called Sadafi. Sadafi got the payment from Lascola and gave it to her. The next two payments also were late, and after the May 2008 payment, Lascola stopped paying altogether.

Kennedy had been concerned that she had not received the deeds of trust to secure her loan. At some point, Sadafi told Kennedy she had the deeds of trust, but she realized the wrong property was listed, so she had to get Lascola to fix it. On May 18, Sadafi called Kennedy and said she had the corrected deeds of trust. Sadafi said Kennedy needed to record them right away, and told Kennedy to meet her at the Van Nuys recorder's office. When Kennedy arrived, Sadafi gave her the deeds of trust. Kennedy did not read them; she saw they were from Conejo Partners and were made out to Kennedy and her mother, so she did not bother looking at anything else. Kennedy was not aware that Conejo Partners did not own the property that Sadafi sold; Sadafi had sold the property to Shea Estates, an entity apparently associated with Lascola.

Lascola did not make any payment on the loan in June 2008. In July, Sadafi wrote checks to Kennedy and her mother for amounts equal to two months worth of payments. Sadafi wrote on top of the check to Kennedy that it was for June and July 2008, and wrote on the memo line, "Note on Investment with Paul." On the check to Kennedy's mother, Sadafi wrote, "Note that she has with Paul." Sadafi wrote similar checks to Kennedy and her mother in August and September. It was Kennedy's understanding that Sadafi had taken over making the payments on Kennedy's loan to Lascola.

In early October 2008, Sadafi called Kennedy and told her they needed to go to Sadafi's attorney's office because she had discovered that Lascola had sold the property. She asked Kennedy to pick her up, and to bring all of her documents with her. On the way to the attorney's office, Sadafi asked Kennedy not to tell the

7

attorney, Stanley Lopata, that Sadafi had introduced Kennedy to Lascola or that Sadafi had been making payments on Lascola's notes. She told Kennedy to tell Lopata that she (Kennedy) met Lascola in a coffee shop. Kennedy told her she was not going to do that because Lopata would think she was insane to give $80,000 to someone she did not know who coincidentally happened to be Sadafi's business partner. Instead, Kennedy told Lopata the truth.

At the meeting in the attorney's office, Lopata began by asking who was going to pay Kennedy's attorney fees. Sadafi responded, "I am. Gael has nothing to worry about. She's protected by me." After looking at Kennedy's documents, Lopata asked them to come back the following day, because Sadafi had not brought any of her documents. They returned next day, and discussed having a written agreement between Sadafi and Kennedy regarding the property. Kennedy said that she would draft a memo with the terms of the agreement, and Lopata could finalize it.

After the meeting, Kennedy faxed her draft of the agreement to Lopata. The draft provided, among other things, that Sadafi would "continue to pay as per the promissory note with Conejo Partners/Paul Lascola until October 15, 2008 and then agrees to pay 7 percent thereafter on the monies invested by Ms. Kennedy and Mrs. Lehrer [i.e., Kennedy's mother] until all monies are returned in full to Ms. Kennedy and Mrs. Lehrer." This term was based upon the discussions Kennedy and Sadafi had with Lopata, and was agreed to by Sadafi.

Kennedy and Sadafi next met with Lopata on November 7, 2008. Kennedy understood that the purpose for the meeting was to finalize the agreement and learn more about what was happening with Lascola. Kennedy and Sadafi went in separate cars, and Kennedy arrived first. Lopata began to explain what was happening with the property and the loan. Kennedy was having difficulty understanding what he was telling her, but told Lopata that Sadafi would take care

8

of it and explain it all to her. When Sadafi arrived, she "was in a complete frenzy." Kennedy told Sadafi what Lopata had told her. Sadafi said she did not need Kennedy to explain anything, and announced, "I owe you nothing." When Kennedy asked what she was talking about, and reminded her about their previous discussions with Lopata, Sadafi said, "I never said anything. . . . I never paid you anything, and I never promised you anything, and I never signed any agreement with you, any deal memo, this is all lies." Kennedy was shocked.[4]

Kennedy did not receive any more payments on her loan to Lascola. She never received any return on her investment with Thurber/Camex, and her stock in Facinet is worthless. She subsequently learned that Sadafi had made several misrepresentations to her; among other things, she learned that Sadafi had never invested with Thurber, and did not invest in Camex.

Kennedy and her husband had to sell their house in a short sale; they could not get a loan or a modification of their mortgage because they no longer had any money in their bank accounts. She believes that Sadafi received some of the money she had invested with Thurber and Lascola because Sadafi did substantial work on her house at the time Kennedy made the investments.

Kennedy filed the instant lawsuit against Sadafi, Lascola, Conejo Partners, Shea Estates Development Corporation, and Thurber in January 2009. Her lawsuit was consolidated with an earlier-filed lawsuit filed by third parties against Lascola.

---

[4]  At trial, Lopata did not recall how many times he met with Kennedy and Sadafi. He also did not recall receiving any of the letters or documents Kennedy faxed to him, although he presumed he received them. He did recall one meeting with Kennedy and Sadafi, which occurred after Sadafi called him to say she "was doing some kind of a contract with Ms. Kennedy." He recalled that Kennedy arrived first, and that he and she had talked before Sadafi arrived, although he did not recall what they talked about. When Sadafi arrived, Kennedy "said something along the lines of that they were there for a contract to guarantee Ms. Kennedy's investment, and Ms. Sadafi said there was no such agreement, and then the two of them started yelling at each other."

Kennedy's operative first amended complaint, filed in April 2009, alleged claims for breach of written contract, breach of oral contract, breach of fiduciary duty, fraud in the inducement, conversion, and imposition of constructive trust and equitable loan. In January 2011, Sadafi filed a cross-complaint against Kennedy alleging claims for breach of oral contract and fraud.

The case went to trial before a jury in September 2011 on Kennedy's fraud, breach of fiduciary duty, and breach of oral contract claims against Sadafi, and Sadafi's fraud and breach of oral contract claims. The jury found in favor of Kennedy on her fraud claim, and awarded her $87,200 in economic damages and $25,000 in noneconomic damages. The jury found against Kennedy on her breach of fiduciary duty claim (finding that Sadafi was not Kennedy's business manager), and found that although Kennedy and Sadafi entered into a contract whereby Sadafi agreed to repay Kennedy for the amounts she invested with Thurber/Camex and/or Lascola, Kennedy suffered no damages for breach of that contract. The jury found against Sadafi on Sadafi's fraud and breach of contract claims. Finally, the jury found that Sadafi engaged in conduct with malice, oppression, or fraud, and awarded Kennedy $225,000 in punitive damages.

The trial court entered judgment on October 19, 2011, and notice of entry of judgment was served by Kennedy on November 1, 2011. On November 17, 2011, Sadafi filed a notice of intention to move for a new trial. Sadafi filed her points and authorities in support of her motion for a new trial, along with a motion for judgment notwithstanding the verdict, on November 28, 2011. Kennedy opposed both motions on the ground that they were untimely, among other grounds. Sadafi filed a notice of appeal before the hearing on the motions, and did not appear at the hearing. The trial court denied both motions on the grounds set forth in Kennedy's opposition papers, and found that the jury verdict was consistent with the evidence presented at trial.

10

# DISCUSSION

Sadafi raises numerous issues in her opening brief on appeal, which we have consolidated into the following: (A) sufficiency of the evidence to support Kennedy's fraud claim;[5] (B) evidentiary issues; (C) legal issues regarding mitigation and causation; (D) denial of motions; (E) misconduct; (F) cumulative error; and (G) punitive damages. Only Sadafi's objection to the award of punitive damages has merit.

## A.     *Sufficiency of the Evidence*

Sadafi challenges the sufficiency of the evidence to support Kennedy's fraud claim, asserting that Kennedy "fail[ed] to prove all the elements of fraud." Sadafi has waived this argument by failing to set forth in her appellant's opening brief all of the material evidence presented at trial.

As our Supreme Court has explained, "'[i]t is well established that a reviewing court starts with the presumption that the record contains evidence to sustain every finding of fact.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.) It is the appellant's burden to demonstrate in its appellant's opening brief that the record does not contain sufficient evidence to support the findings. To satisfy this burden, the appellant is required to set forth in her brief *all* material evidence presented at trial on the challenged points. (*Ibid.*; accord, *In re Marriage of Fink* (1979) 25 Cal.3d 877, 887.) "'Unless this is done the error is deemed to be waived.'" (*Foreman & Clark Corp. v. Fallon*, *supra*, 3 Cal.3d at p. 881; see also

---

[5]     Kennedy has moved to strike portions of Sadafi's reply brief related to the reasonable reliance element of the fraud claim, because Sadafi's argument is premised on certain testimony that she presents as having been given by Kennedy; in fact, that testimony was by Alawar. We grant that motion.

*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738 ["'A party who challenges the sufficiency of the evidence to support a particular finding must *summarize the evidence* on that point, *favorable and unfavorable*, and *show how and why it is insufficient.*' . . . Where a party presents only facts and inferences favorable to his or her position, 'the contention that the findings are not supported by substantial evidence may be deemed waived'"].)

In her opening brief, Sadafi makes no attempt to summarize all of the evidence Kennedy presented to support her claim of fraud. Instead, Sadafi presents only her version of the events at issue, omitting many key facts. Because Sadafi failed to meet her burden to set forth all of the material evidence presented on Kennedy's fraud claim, we find she has waived her challenge to the sufficiency of the evidence.[6] (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218.)

B.    *Evidentiary Issues*

Sadafi raises several evidentiary issues, one under a separate heading in her opening brief (related to the trial court's denial of her motion in limine to exclude evidence that Sadafi orally guaranteed the debts of another), and others included in Sadafi's argument regarding cumulative error. We find no prejudicial error as to any of issues raised.

We begin with Sadafi's contention that the trial court erroneously denied her motion in limine. Sadafi sought to exclude evidence that she agreed to pay

---

[6]    In addition to failing to present a fair summary of all of the material evidence presented at trial regarding Kennedy's fraud claim, Sadafi omitted any legal analysis of the claim. Instead, Sadafi stated that the analysis was set forth in her motion for JNOV, which she purported to incorporate by reference. Incorporation by reference is not permitted in appellate briefs. (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20.)

Kennedy the money Kennedy invested with Thurber and/or Lascola, arguing that the evidence was inadmissible because the alleged agreement constituted an oral contract to guarantee the debts of another, and thus was barred by the statute of frauds. (Citing Civ. Code, § 1624, subd. (a)(2).) The trial court denied Sadafi's motion, finding the evidence could come in for other purposes.

On appeal, Sadafi contends the trial court erred because the evidence was not used for other purposes. She is incorrect. Evidence that Sadafi told Kennedy that she would write her a check for $50,000 after Thurber ran off with the money people had invested was relevant to explain why Kennedy continued to trust Sadafi and agreed to provide a bridge loan to Lascola. Similarly, evidence that Sadafi told Kennedy that her loan to Lascola was safe because if Lascola defaulted, Sadafi would foreclose on the property and Kennedy would be repaid from the proceeds, was relevant to show that Kennedy's reliance on Sadafi was reasonable. Sadafi's contention that the oral agreement was invalid under the statute of frauds is beside the point. Even if Sadafi were correct that the agreement was not enforceable (a moot issue in light of the jury's finding that Kennedy suffered no damages from its breach), that would not preclude admission of its existence for other purposes.[7]

---

[7] To the extent Sadafi argues she was prejudiced by the trial court's refusal to give a jury instruction on the issue of oral guarantees and the statute of frauds, she has forfeited the issue by failing to provide an adequate record. During the discussion between the trial court and counsel on the instructions, which was recorded, counsel for Sadafi asked the court to give certain instructions related to contracts. The court declined to give them as written, but told counsel they could have some time to work out any modifications to the instructions. The court subsequently read the instructions as agreed upon by the parties. The record does not include a written copy of the jury instructions that were given, and the parties stipulated that the instructions could be read without being taken down by the court reporter. Because we do not have a record of what instructions were given, we must presume the instructions given were correct and there was no error. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296 [in the absence of a proper record on appeal, the trial court's rulings are presumed correct].)

Thus, the trial court properly denied Sadafi's motion in limine. (Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible"].)

With regard to the other evidentiary issues Sadafi raises, she fails to show any abuse of discretion by the trial court and/or prejudice resulting from the court's rulings.

For example, Sadafi asserts the trial court improperly overruled her objection to testimony by Alawar and another witness regarding her truthfulness or reputation for honesty. Sadafi, however, was a witness, and the evidence at issue was relevant to her credibility. (Evid. Code, §§ 780, subd. (e), 785, 1101, subd. (c).) Thus, the trial court did not abuse its discretion by overruling the objections.

Nor did the trial court abuse its discretion by overruling Sadafi's hearsay objection to the admission of Kennedy's prescriptions. The prescriptions were not offered for the truth of any statement, but were instead offered to show that Kennedy sought treatment from her doctor after she was defrauded. In any event, Sadafi could not show any prejudice from the admission of the prescriptions themselves, inasmuch as Kennedy testified, without objection, that she was treated with medication after the events at issue.

Similarly, Sadafi cannot show she was prejudiced by the trial court's exclusion of emails Kennedy received from Facinet. Sadafi asserts the emails were not offered for the truth of the statements contained in them, but rather to show that Kennedy had communications with Facinet. But as the court noted, the emails included inadmissible hearsay statements. Sadafi was not prejudiced by their exclusion because Kennedy was extensively questioned about the emails, and admitted that she had communications with Facinet.

Finally, Sadafi contends the trial court erroneously overruled her foundation and authentication objection to the introduction of Sadafi's husband's American Express statements. Kennedy testified that, although Sadafi had initially told her

14

she had sent Thurber a money order to make her investment in Camex, after Kennedy filed the instant lawsuit, Sadafi stated in discovery responses that she paid Thurber through her husband's private American Express account. Kennedy testified that, when asked for proof of that payment, Sadafi responded that she and her husband had divorced and she did not have access to the account. Kennedy obtained copies of statements from American Express, and testified that they showed a charge of $26,000 from Net Serve Computer Software, which Kennedy stated was a company solely owned by Thurber, and that the balance owed was never paid. Sadafi objected to the admission of the documents on the grounds that there was no foundation and they were not authenticated. The trial court overruled the objection, saying that Sadafi may cross-examine on those issues. Sadafi contends on appeal that cross-examination "was not sufficient. One cannot un-ring the bell. The jury heard the testimony and saw the document on the projection screen. . . . Sadafi was clearly prejudiced by this tactic." We fail to see how Sadafi was prejudiced by the admission of the American Express statements, and Sadafi offers no explanation. Thus, we need not decide whether the trial court abused its discretion by overruling Sadafi's objection, because Sadafi failed to demonstrate that admission of the statements resulted in a miscarriage of justice. (Evid. Code, § 353 [erroneous admission of evidence is not ground for reversal unless it resulted in a miscarriage of justice].)

C.     *Legal Issues Related to Mitigation and Causation*

Sadafi contends the trial court erred by not dismissing Kennedy's lawsuit because Kennedy failed to mitigate her damages by foreclosing on the property that Sadafi sold to Lascola, and that Sadafi could not be held liable for Kennedy's damages because intervening acts "broke the chain of causation." She is incorrect.

15

While Sadafi is correct that a secured creditor is required to look to the security for payment of the debt (see, e.g., Code Civ. Proc., § 726), that rule is not applicable here. Regardless whether the rule applies when the plaintiff seeks to recover from a third party for fraud, as is the case here, the evidence at trial was that Kennedy was *not* a secured creditor because the deeds of trust she was given were invalid. Sadafi's own attorney filed a sworn declaration earlier in the case, stating that the deeds of trust were from Conejo Partners (which was the entity to whom Kennedy wrote the checks she gave to Lascola), but Conejo Partners never had any interest in the property. Thus, Kennedy's loan was never secured, and she had no ability to foreclose.

Just as Sadafi's argument on mitigation ignores the evidence that undermines its factual premise -- i.e., that Kennedy was a secured creditor -- her argument that the chain of causation was broken similarly ignores the evidence that undermines it. She contends that Kennedy's rejection of Sadafi's offer to write her a check for $50,000 for the Thurber investment "breaks any Sadafi theoretical liability." Kennedy testified, however, that Sadafi told her that she could take the Facinet stock rather than the check at that time, and that if anything happened with Facinet, Sadafi would write her a check in that event. Thus, Kennedy did not reject Sadafi's offer, causing a "break" in causation or liability.

Nor was there a "break" in causation or liability due to Kennedy's actions to prevent Sadafi from foreclosing on the property she sold to Lascola. As Sadafi notes, she tried to foreclose on the property, but Kennedy sought an injunction to prevent the foreclosure.[8] Sadafi argues on appeal that she sought to foreclose so

---

[8] The details regarding Kennedy's judicial actions to prevent Sadafi from foreclosing are not particularly relevant to the issues in this appeal, and therefore we do not set them out in this opinion. Suffice to say that Sadafi was unable to foreclose on the property after March 2009.

she could recover the $200,000 Lascola owed her and pay Kennedy the $80,000 she was owed. But Sadafi testified at trial that Kennedy had no interest in the property, and Kennedy testified that Sadafi told her in November 2008 that she (Sadafi) did not owe anything to Kennedy. Therefore, Kennedy's actions to enjoin the foreclosure did not break the chain of causation; instead, Kennedy simply sought to protect her ability to recover from Sadafi in the event she obtained a judgment against her.

D.    *Denial of Motions*

Sadafi contends the trial court erred by denying her motion for judgment on the pleadings (which was in the form of a motion in limine), her motion for nonsuit, and her posttrial motions. We disagree.

With regard to the motion for judgment on the pleadings, Sadafi argues the trial court denied it on improper grounds, i.e., because it was in the form of a motion in limine. Sadafi asserts the court erred because motions in limine can operate as a general demurrer or a motion for judgment on the pleadings. (Citing *City of Livermore v. Baca* (2012) 205 Cal.App.4th 1460, 1465.) While Sadafi is correct on the law, she does not address the merits of her motion in her opening brief on appeal. Thus, she has failed to show the court's denial was prejudicial error.

Sadafi contends the trial court erred by denying her motion for nonsuit at the close of Kennedy's case because Kennedy did not provide any evidence of the value of the Facinet stock she received, she did not present expert witnesses to testify about her inability to foreclose on the property that purportedly secured her loan to Lascola or the value of the property, and the alleged oral agreement was barred by the statute of frauds. As to her first point, Sadafi ignores the testimony given by Kennedy, her husband, and Alawar that the stock was worthless. With

regard to the absence of expert witnesses, none was necessary. As we have noted, Sadafi's attorney stated in a sworn declaration that Kennedy had no interest in the property at issue; the jury did not need an expert witness to explain that Kennedy therefore could not foreclose and recover the amount of the loan, regardless of the value of the property. As to the contract issue, as we explained previously, to the extent the oral agreement was an oral guarantee barred by the statute of frauds (an issue we do not decide), Sadafi suffered no harm by the court's failure to dismiss the breach of contract claim because the jury found Kennedy suffered no damages.

Finally, Sadafi's contention that her posttrial motions were improperly denied has no merit. As an initial matter, we note that Sadafi has made no effort to even describe the motions. Instead, she purports to incorporate them by reference "to show which arguments were raised in the trial court." As we noted with regard to her sufficiency of the evidence challenge, incorporation by reference is not permitted in appellate briefs. (*Soukup v. Law Offices of Herbert Hafif*, *supra*, 39 Cal.4th at p. 294, fn. 20.) Thus, she has forfeited the issue by failing to adequately brief it.

In any event, the trial court properly denied the motions because they were untimely. Code of Civil Procedure section 659 (section 659) provides that a notice of intention to move for a new trial must be filed within 15 days of service upon the moving party of a written notice of entry of judgment. (Code Civ. Proc., § 659, subd. (a)(2).) Section 659 also provides that the time to file a notice of intent is not extended by the provisions of Code of Civil Procedure section 1013 (section 1013), which ordinarily extends the time for performing any act within a time period following service of a document by mail. (Code Civ. Proc., §§ 659, subd. (b), 1013, subd. (a).) Under Code of Civil Procedure section 629, a motion for judgment notwithstanding the verdict (or JNOV) must be filed within the period specified by section 659, i.e., within 15 days of service of a notice of entry of

judgment, without the extension provided for service by mail under section 1013. The time limit imposed on filing the notice of intent or motion are jurisdictional; without compliance with the time limit, the trial court does not have jurisdiction to rule on the motions. (*Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, 1271; *Fong Chuck v. Chin Po Foon* (1947) 29 Cal.2d 552, 553-554; *Prothero v. Superior Court* (1925) 196 Cal. 439, 444; *Neale v. Morrow* (1916) 174 Cal. 49, 51-52.)

In this case, Kennedy served by mail the notice of entry of judgment on November 1, 2011. The 15-day period for filing a notice of intent to move for a new trial (or a motion for judgment notwithstanding the verdict) ended on November 16, 2011. Sadafi filed her notice of intent on November 17, 2011, and filed her motion for judgment notwithstanding the verdict on November 28, 2001. Neither document was timely filed. Thus, the trial court did not have jurisdiction to act on them.

E.      *Misconduct*

Sadafi contends that Kennedy and her attorney committed several acts of misconduct that caused her prejudice. Most of the acts Sadafi raises did not constitute misconduct, and none was unduly prejudicial.

The most serious act Sadafi raises involved Kennedy's testimony that Lascola was in jail. Before trial, Sadafi made a motion in limine to exclude evidence of criminal charges against Lascola.[9] The trial court granted that motion. Kennedy was present when the court granted the motion. During trial, when Kennedy was testifying, her attorney asked her, "Do you know the whereabouts of Mr. Lascola at this time?" Sadafi's attorney immediately objected, but the court

---

[9]      Lascola had been arrested a week before the trial, and was in custody.

19

overruled the objection and told Kennedy she could answer. Kennedy said, "Yes. He's in jail." Sadafi's attorney objected, and the court ordered the answer stricken, saying "The jury will disregard the last statement. The question was merely, 'Do you know?' Disregard the question and answer as if you never heard it."

Later, outside the presence of the jury, Sadafi's attorney raised the issue with the court, asserting that it constituted misconduct by both Kennedy and her attorney. The court agreed that it was a violation of its order on Sadafi's motion in limine, and asked what relief Sadafi sought. The attorney asked for a mistrial. The court impliedly denied that request, noting that the jury was immediately instructed to disregard the answer, which was stricken. The court, however, told Sadafi's counsel that it would consider any request for other relief.

It appears that Sadafi and Kennedy subsequently agreed to have a special instruction read to the jury. The next day, the court began the proceedings by reading the agreed-upon instruction: "In this trial Ms. Kennedy stated that Mr. Lascola was in jail. You are to give no weight whatsoever to this testimony and must disregard it in its entirety. Mr. Lascola is unavailable as a witness for reasons unrelated to the facts of this case. [¶] Furthermore, Ms. Kennedy and her counsel were explicitly ordered not to make any such reference. You may use Ms. Kennedy's disobedience of this court's order in evaluating Ms. Kennedy's or her attorney's conduct."

Given this special instruction -- particularly the statements that the reason for Lascola's absence was unrelated to the facts of this case, that Kennedy disobeyed a court order, and that the jury could consider Kennedy's disobedience of the court's order in evaluating her conduct -- any possible prejudice to Sadafi caused by Kennedy's testimony was cured. (See, e.g., *Grimshaw v. Ford Motor Co.* (1981) 119 Cal.App.3d 757, 794 [plaintiff's counsel asked question in

20

violation of ruling on motion in limine; prompt admonition to jury to disregard question cured any prejudice].)

We turn now to the other purported acts of misconduct. In her opening brief, Sadafi lists the following as acts of misconduct: (1) Kennedy made references to Thurber's criminal conduct throughout the trial, in violation of another motion in limine the court granted to exclude any reference to criminal conduct by Thurber; (2) Kennedy's attorney elicited testimony from Alawar regarding the complaint he filed with the Department of Corporations regarding Thurber; (3) Kennedy and her attorney made references to the fact that Sadafi did not call Thurber or Lascola to testify; (4) Kennedy's husband testified that he believed the deeds of trust Lascola gave to Kennedy were worthless; (5) Kennedy's attorney argued to the court that an oral agreement to pay the debts of another is enforceable; (6) Kennedy's attorney represented to Sadafi during her testimony that the document admitted as Exhibit 10 was the "full history" of her American Express bill, even though it included only the invoices from 2006; (7) Kennedy's attorney attempted to intimidate Thurber by telling Sadafi and the trial court that he would seek to have Thurber arrested on outstanding warrants if he appeared in court to testify; (8) Kennedy's attorney misled the jury by stating several facts that were contrary to the evidence; and (9) Kennedy testified that she believed Sadafi was paid commissions on Kennedy's investment with Lascola because Sadafi remodeled her house, even though Kennedy admitted that she never saw the remodel.

As to the first purported act -- references to Thurber's criminal conduct -- Sadafi does not cite to the reporter's transcript showing any such reference, and we could find no improper reference to criminal activity in our independent review of the record. While it is true that Kennedy's counsel questioned Alawar about his complaint to the Department of Corporations and the Department's cease and

21

desist order, the trial court concluded that this testimony did not violate its order because it did not involve *criminal* conduct. The fact that Sadafi disagrees with the trial court's ruling finding the cease and desist order admissible does not make counsel's questioning of Alawar or other references to it misconduct.

Similarly, the other acts Sadafi points to are not misconduct as much as they are differing views of the evidence or law, or minor misstatements. They certainly do not require reversal of the judgment. "'The term "misconduct" is generally used in connection with trials to mean the disregard of rules of evidence or procedure for the purpose and with the effect of prejudicing the adverse party's claim or defense before a jury.' [Citation.] . . . [¶] . . . As the Supreme Court noted nearly eighty years ago, '[i]t rarely occurs in any case which is of moment and sharply contested that counsel on both sides in their zeal and partisan devotion to their clients do not indulge in arguments, remarks, insinuations, or suggestions which find neither support in, nor are referable or applicable to the testimony, or warranted by any fair theory upon which the case is being presented. If such impropriety of counsel always afforded ground for a new trial, there would be little prospect of any litigation becoming finally determined. It is only when the conduct of counsel consists of a willful or persistent effort to place before a jury clearly incompetent evidence, or the statements or remarks of counsel are of such a character as to manifest a design on his part to awake the resentment of the jury, to excite their prejudices or passions against the opposite party, or to enlist their sympathies in favor of his client or against the cause of his adversary, and the instructions of the court to the jury to disregard such offered evidence or objectionable remarks of counsel could not serve to remove the effect or cure the evil, that prejudicial error is committed. It is only in extreme cases that the court, when acting promptly and speaking clearly and directly on the subject, cannot, by instructing the jury to disregard such matters, correct the impropriety of the act of

22

counsel and remove any effect his conduct or remarks would otherwise have.' [Citation.]" (*Menasco v. Snyder* (1984) 157 Cal.App.3d 729, 732, quoting *Tingley v. Times Mirror* (1907) 151 Cal. 1, 23.)  This is not one of those extreme cases.


F.      *Cumulative Error*

Sadafi contends that even if the errors she cites caused insufficient prejudice on their own to require reversal of the judgment, the cumulative effect of the errors was highly prejudicial and sufficient to require reversal.  We disagree.

Preliminarily, we note that, as discussed above, many of Sadafi's claimed errors were not in fact erroneous.  Moreover, even if there were rulings by the trial court that were not strictly correct, there is no reason to believe it likely that contrary rulings would have resulted in a different outcome.  Nevertheless, Sadafi, like the appellant in *Dam v. Lake Aliso Riding School* (1936) 6 Cal.2d 395, "proceeds upon the assumption that a multitude of minor errors acquires the cumulative force of grave and prejudicial error." (*Id.* at p. 399.)  We echo the Supreme Court in that case:  "This might be possible when they establish a course of conduct from which the court can infer that the appellant was deprived of a fair trial.  But the intelligence and spirit of fairness usually manifested by trial courts makes very exceptional the unfair conduct of a trial.  We are unable to say that there was any such unfair trial in this case." (*Ibid.*)


G.      *Punitive Damages*

Sadafi attacks the award of punitive damages on two grounds.

First, she contends the award was improper because Kennedy failed to ask the jury to find that her claim for punitive damages was proved by clear and convincing evidence.  She has forfeited that issue, however, because she failed to provide an adequate record.  As we noted in footnote 7, *ante*, the record does not

include the jury instructions.  In the absence of a record showing otherwise, we presume the jury was properly instructed that it must find by clear and convincing evidence that Sadafi was guilty of oppression, fraud, or malice.  (*Maria P. v. Riles*, *supra*, 43 Cal.3d at pp. 1295-1296.)

Second, Sadafi contends the award of punitive damages must be reversed because Kennedy failed to present evidence of Sadafi's financial condition.  Kennedy responds that Sadafi waived any claim of excessive punitive damages by failing to make a timely motion for a new trial (citing, among other cases, *Campbell v. McClure* (1986) 182 Cal.App.3d 806, 807-808, 811-812 (*Campbell*)), but that in any event, she presented sufficient evidence of Sadafi's financial condition to support the award.  Sadafi has the better argument.

"An award of punitive damages hinges on three factors:  the reprehensibility of the defendant's conduct; the reasonableness of the relationship between the award and the plaintiff's harm; and, in view of the defendant's financial condition, the amount necessary to punish him or her and discourage future wrongful conduct."  (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 914.)  The California Supreme Court has held that "evidence of the defendant's financial condition is a prerequisite to a punitive damages award," and the burden of producing that evidence falls on the plaintiff.  (*Adams v. Murakami* (1991) 54 Cal.3d 105, 119 (*Adams*).)

Kennedy's reliance on *Campbell* to support her assertion that Sadafi forfeited her challenge to the punitive damages award by failing to timely file a motion for a new trial is misplaced.  The plaintiff in *Campbell* challenged the method by which the trial court fixed the amount of the punitive damages, and argued the amount of the award was excessive.  The appellate court held that the plaintiff's failure to move for a new trial "precludes our review of the amount of the award, a question depending upon resolution of conflicting factual evidence

best resolved by the trier of fact." (*Campbell*, *supra*, 182 Cal.App.3d at pp. 811-812.)

Campbell, however, was decided before the Supreme Court decided *Adams*. In that case, the Supreme Court held that a plaintiff cannot be awarded *any* punitive damages without first presenting evidence of the defendant's financial condition. (*Adams v. Murakami, supra,* 54 Cal.3d at p. 119 ["Because the award, *whatever its amount*, cannot be sustained absent evidence of the defendant's financial condition, such evidence is 'essential to the claim for relief'"], italics added.) The Supreme Court also rejected the argument in that case that the plaintiff failed to preserve the argument, finding that the issue is a legal one involving a matter of important public policy, and that the primary interest to be protected is a public interest, which cannot be "thwarted by a defendant's oversight or trial tactics." (*Id.* at p. 115, fn. 5; see also *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1283-1284.) Similarly, we hold that Sadafi's argument was not forfeited by her failure to timely file a motion for new trial.

We also reject Kennedy's assertion that she presented sufficient evidence of Sadafi's financial condition. Although there was evidence that Sadafi is a real estate investor, who owns an investment company, has commercial and residential property, and makes around $150,000 per year from her investments, there was no evidence of the value of her assets, her liabilities, or her net worth. Thus, Kennedy failed to meet her burden in seeking punitive damages. (See, e.g., *Kelly v. Haag*, *supra*, 145 Cal.App.4th at p. 917 [evidence that defendant owns property is insufficient where there was no evidence of any encumbrances on the property or any other liabilities]; *Lara v. Cadag* (1993) 13 Cal.App.4th 1061, 1063 [evidence that defendant owns and operates a medical clinic with monthly net profit of $3,000 and has additional income of $5,000 to $6,000 per month is insufficient where there was no evidence of value of assets and liabilities].) Because Kennedy

had a full and fair opportunity to present her case for punitive damages but presented insufficient evidence to meet her burden, we conclude she is not entitled to a retrial on the punitive damages issue, and we will direct the trial court to strike that portion of the judgment awarding punitive damages to Kennedy. (*Kelly v. Haag*, *supra*, 145 Cal.App.4th at p. 919.)

## DISPOSITION

The judgment is reversed to the extent it awards punitive damages to Kennedy. The matter is remanded to the trial court with directions to strike that portion of the judgment. In all other respects, the judgment is affirmed. Sadafi shall pay Kennedy's costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.

SUZUKAWA, J.

26